UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ANTHONY L. ARCINIAGA,

                    Plaintiff,

                05 Civ. 6426 (HB)

     – against –

                <u>OPINION & ORDER</u>

GENERAL MOTORS CORPORATION,

                    Defendant.
--------------------------------------------------------X

**Hon. Harold Baer, Jr., District Judge**[*]:

     Before the Court are cross motions. Plaintiff Anthony L. Arciniaga ("Arciniaga") seeks an order to stay arbitration and Defendant General Motors Corporation ("GM") seeks an order to compel arbitration and stay this action. For the following reasons, Arciniaga's motion to stay arbitration is GRANTED.

## I.    BACKGROUND

     In 1995, Arciniaga and GM, an automobile manufacturer, entered into an agreement to jointly invest in Douglaston Chevrolet-Geo, Inc. d/b/a Bay Chevrolet ("Bay Chevrolet"), a Delaware corporation operating a Chevrolet dealership in Douglaston, New York. The parties contemplated two main contracts to comprise the corporate structure. Under the first, a Stockholders Agreement, GM provided most of the necessary capital for the business and received 11,900 shares of preferred stock while Arciniaga contributed the remaining amount in exchange for 2,100 shares of common stock and assumed responsibility as President of the dealership in charge of the day-to-day operations. As the dealership became more profitable, Arciniaga could redeem the preferred shares of stock held by GM until he became the sole owner of the dealership. However, GM retained the right to purchase Arciniaga's common stock if the dealership suffered a loss of 20% of its original franchise capital. The second agreement, the GM

---

[*] Anna Fontana, a fall 2005 intern in my Chambers, and currently a third-year law student at St. John's University School of Law, provided substantial assistance in the research and drafting of this Opinion.

1

Dealer Sales and Service Agreement ("Dealer Agreement"), was a standard contract between GM and the dealership, Bay Chevrolet. In 1999, GM and Arciniaga initiated an "Action by Board of Directors and Stockholders for Plan of Reorganization by Written Consent" to facilitate Arciniaga's immediate redemption of 4,000 shares of preferred stock. At that time, GM and Arciniaga amended the Stockholders Agreement to allow GM to buy Arciniaga's common stock if the dealership suffered losses in excess of $200,000, and to include a mandatory arbitration agreement covering all aspects of the investment relationship and operation of the dealership.

As of February 28, 2005, Bay Chevrolet reported losses in the amount of $293,236. This triggered GM's right to call the balance of Plaintiff's stock under the Stockholders Agreement, and on March 14, 2005, GM did just that. Arciniaga was also removed from his position as President of Bay Chevrolet. This obliterated any paternalism the Plaintiff may have been counting on and on July 15, 2005, Arciniaga filed a complaint in this Court asserting claims relating to the Stockholders Agreement for discrimination, breach of express and implied contract rights, and fraud, pursuant to the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221–26 (2005).

## II. DISCUSSION

The Defendant seeks to stay and proceed to arbitration. To determine if arbitration is mandated, the court must look at: 1) whether there was an agreement between the parties to arbitrate, 2) whether the agreement covered this particular dispute, and 3) whether Congress has enacted a federal statute to prohibit arbitration under the facts of this lawsuit. See Genesco, Inc. v. T. Kakiuci & Co., 815 F.2d 840, 844 (2d Cir. 1987).

An agreement to arbitrate was signed by the parties in 1999 when the Stockholders Agreement was amended. That agreement is broad enough to encompass the dispute now at issue. The question then requires a determination as to whether the limitation on arbitration in the ADDCA is applicable here. The ADDCA provides that whenever arbitration is contemplated in a motor vehicle franchise contract both parties must consent to arbitration after the dispute arises. See 15 U.S.C. § 1226(a)(2)("whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a

controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy"). Here, there was no consent by both parties thus the parties are not required to submit to arbitration.

## A. The Stockholder Agreement Between Investors Constitutes a "Motor Vehicle Franchise Contract"

GM argues that the ADDCA is not applicable to this case because Arciniaga only raises claims with regard to the Stockholders Agreement and not the franchise arrangement, which according to GM is only comprised of the Dealer Agreement made between Bay Chevrolet and GM. But situations like these are precisely what Congress contemplated when it enacted the ADDCA as a remedy to redress the disparity in economic power between automobile manufacturers and franchise dealers. Automobile Dealers' Day in Court Act, ch. 1038, 70 Stat. 1125 (1956) (codified as amended at 15 U.S.C. §§ 1221–1225 (2005). It is undisputed that the law was passed in an effort to remedy the unequal bargaining power that plagued the industry when contracts were made between individuals who wanted to own dealerships and large manufacturers who sought to retain power and control over the business. The ADDCA was intended to protect automobile dealers from unfair and coercive practices. See also Maschio v. Prestige Motors, 37 F.3d 908, 910 (3d Cir. 1994)(The ADDCA was passed to "redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices.").

Section 1226(a)(1)(B) of the Act states that a "'motor vehicle franchise contract' means a contract under which a motor vehicle manufacturer, importer, or distributor sells motor vehicles to any other person for resale to an ultimate purchaser and authorizes such other person to repair and service the manufacturer's motor vehicles." Nowhere in the ADDCA is a franchise contract limited to one piece of paper. Taking into account the policy behind the ADDCA and the fact that this is a remedial statute that should be construed broadly, Congress did not intend to limit the definition of motor vehicle

3

franchise contract so as to exclude instances like this where the corporate structure is not strictly a franchise agreement in form but closely resembles one in substance.

The ADDCA, as it stood prior to the addition of the Motor Vehicle Franchise Contract Arbitration Fairness Act, 15 U.S.C. § 1226, failed to address the power of the manufacturers' bargaining power when dealing with the motor vehicle franchise contract itself.  See The Motor Vehicle Franchise Contract Arbitration Fairness Act Report, S. REP. NO. 107-266 (2002) (Comm. on the Judiciary).  The Committee Report shows that Congress sought to cover situations like this.

> Today, almost every major motor vehicle manufacturer uses mandatory binding arbitration either in the dealer franchise contract or in side contracts with certain dealers. Manufacturers increasingly are inserting mandatory binding arbitration clauses in non-negotiated side contracts with dealers, such as those governing dealer finance disputes and incentive disputes.

Id.  Congress was concerned about manufacturers using these side agreements to sidestep the ADDCA and, therefore, intended to capture them within the purview of the statute.

Other courts have recognized that multiple documents can create a franchise agreement under the ADDCA.  For example, in Kavanaugh v. Ford Motor Co., 353 F.2d 710 (7th Cir. 1965), the court articulated the need to consider these documents together.

> Each dovetails into the other.  Each constitutes an inseparable part of the mutual understanding between Kavanaugh and Ford.  We do not think the word "franchise" as used in the [ADDCA] need be restricted to a single document.  If other written agreements are so interwoven with the document ostensibly designated as the franchise as to affect materially the legal significance of the latter, they must be regarded as part of the franchise agreement.

Kavanaugh, 353 F.2d at 715.  Although Kavanaugh was decided prior to the enactment of 15 U.S.C. § 1226, the same policy considerations apply.  The amendment was added to further benefit the automobile dealer and not to place restrictions on the already-existing principles under the ADDCA.  Here, the Dealer Sales and Service Agreement, the

Shareholders Agreement, and other documents (the promissory note and the personal service contract) together made up the understanding between Arciniaga and GM. Collectively, these agreements made it possible for Arciniaga to become an automobile dealer and thus, all of the agreements should be viewed together to constitute a "motor vehicle franchise contract."

GM relies on decisions from other courts that have interpreted the ADDCA too narrowly. The court in <u>Pride v. Ford Motor Co.</u>, 341 F. Supp. 2d 617 (N.D. Miss. 2004), held that a similar set of agreements between the individual shareholder and the automobile manufacturer did not comprise a franchise arrangement. This view of the statute ignores its purpose and the policy behind the law, i.e. to protect individuals from large automobile corporations, and allows industry leaders to create a corporate structure that evades the rule. GM, and its actions in this case, is for me a little reminiscent of that great line form a well-known baseball team manager to the effect that some people are born on third base and think they've hit a triple.

**B. The Contract was Validly Altered or Modified After § 1226 Came into Effect**

The statute specifies that 15 U.S.C. § 1226(a) would apply only to disputes that arose under dealership franchise contracts "entered into, <u>amended</u>, <u>altered</u>, <u>modified</u>, renewed, or extended after the date of the enactment of this Act," November 2, 2002. <u>Id.</u> at § 1226(b)(emphasis added).

The Stockholders Agreement was last amended on October 20, 1999 to incorporate the arbitration provision, but GM altered and modified the Dealer Agreement in 2002, *after* the effective date of the statute. On November 20, 2002, Arciniaga received a letter from the Zone Manager of GM Dealer Contractual Group that stated that as of December 31, 2002, GM would reconfigure and revise each Area of Primary Responsibility ("APR") for all GM dealers. This change in APR re-defined both the geographic area in which the Plaintiff could sell GM products, and his bottom line.

The APR modification on December 31, 2002 altered and modified the original Dealer Sales and Service Agreement. GM argues that this is not a significant amendment and does not trigger the protections of the ADDCA. I disagree. Courts have held that

5

less important events than this constituted an amendment to the franchise agreement. For example, in DaimlerChrysler Vans LLC v. Freightliner of New Hampshire, Inc., No. 03-304, 2004 U.S. Dist. LEXIS 316, at *2, *4–*5 (D.N.H. Jan. 8, 2004), the court determined that the Target Agreements that proposed an annual sales objective, and thus would be used to determine the franchisee's eligibility for bonuses, were considered amendments to the original contract for purposes of 12 U.S.C. § 1226(b). See id. at *5. Similarly, the modification made to the Dealer Sales and Service Agreement in this case affects the sales projections and profits of the dealership. Even if the Addendum is not considered an amendment to the agreement, it is beyond peradventure an alteration or modification and would trigger the protections afforded by the statute.

**C. Arciniaga Can Bring Suit Under the ADDCA as an Individual**

Under the provisions of the ADDCA, an "automobile dealer" is permitted to bring suit against a manufacturer who has failed to act in good faith in regard to a written franchise agreement. 15 U.S.C. §§ 1221–1225 (2005). The statute states that "'automobile dealer' shall mean any person, partnership, corporation, association, or other form of business enterprise . . . operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." Id. at § 1221(c). GM argues that under this definition, Bay Chevrolet would be considered the "automobile dealer," and not Arciniaga. But Arciniaga should also be considered a dealer for purposes of this lawsuit.

As a general rule, individual shareholders cannot bring suit in their own names for an injury suffered by the corporation where the individuals' only harm is solely through depreciation in the value of their shares of stock. See Vincel v. White Motor Corp., 521 F.2d 1113, 1120 (2d Cir. 1975). Although the Second Circuit declined to allow individual shareholders to bring a claim under the ADDCA in Vincel, the court acknowledged that there were exceptions to that rule, for example: 1) a duty is created from the special relationship between the shareholder and the defendant; 2) an action by the corporation provided no remedy to an injured shareholder; and 3) other situations that depended on the nature of the wrong alleged. See id. at 1118–19. The Second Circuit

also pointed with approval to <u>Kavanaugh v. Ford Motor Co.</u>, 353 F.2d 710 (7th Cir. 1965), where the circumstances were so compelling that the corporate entity needed to be disregarded entirely.  See <u>Vincel</u>, 521 F.2d at 1120.

In <u>Kavanaugh</u>, an individual shareholder was entitled to sue Ford Motor Co. ("Ford") after it was determined that denying this right would negate the protective features of the ADDCA.  The court held that it was necessary to look at the facts and circumstances of the situation to decide if the corporate veil should be pierced.  See <u>Kavanaugh</u>, 353 F.2d at 717.  There, because Ford owned all of the voting stock of the dealership and retained complete control of the dealership, Ford essentially was insulated from liability because Ford would never sue itself.  <u>See id.</u>  Kavanaugh was essential to the operation of the dealership and therefore was entitled to the protections of the act in his individual capacity.

Similarly here, GM retained a controlling voting interest in Bay Chevrolet and also drafted the Shareholders Agreement to prohibit the corporate entity from initiating or taking part in any actions on behalf of Bay Chevrolet against GM.  Having thus shielded itself from any claim by the corporate entity until Arciniaga could acquire a controlling interest, GM cannot also shield itself from any claim by Arciniaga asserting his rights as an individual shareholder.  Arciniaga was an essential part of the dealership and, therefore, the fiction of the corporate entity will be set aside and Arciniaga may sue in his individual capacity.

## IV. CONCLUSION

For the foregoing reasons, Arciniaga's motion to stay arbitration is GRANTED and Defendant's motion is DENIED. A Pre-Trial Conference will be held on Monday, November 21, 2005 at 3:30 P.M. The parties are instructed to consult with each other prior to the Pre-Trial Conference and, if possible, agree on a Pre-Trial Scheduling Order in advance of the Conference. The Clerk of the Court is instructed to close these motions and remove them from my docket.

**SO ORDERED.**
New York, New York
November __, 2005

_____
U.S.D.J.